IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO. 3:20-00014

NICHOLAS PAUL WADMAN

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the United States' Motion in Limine Regarding Admissibility of Certain Evidence (ECF No. 32) and its Motion to Allow Witness to Appear via Teleconference. ECF No. 39. Defendant Nicholas Paul Wadman opposes both motions. The Court held a hearing on the motions on August 24, 2020. Upon consideration of the parties' arguments, the Court **GRANTS, IN PART,** and **DENIES, IN PART,** the United States' motion regarding the admissibility of evidence and **DENIES AS MOOT** the United States' motion with respect to allowing a witness to appear via teleconference.

The indictment in this case alleges that, on or about January 8, 2020, at or near Huntington, Cabell County, West Virginia, Defendant knowingly and intentionally transmitted in interstate commerce a communication containing a threat to injure the person of another, in violation of 18 U.S.C. § 875(c). According to the briefing submitted by the parties, on the day of the event, Defendant was visiting his friends Michael Lawson and Jarrod Sammons in their apartment in Huntington. At some point during the evening, the three, together with Sammons' girlfriend at the time, Kayla Raber, played a Jackbox TV video game called "Tee-KO" over a Nintendo Switch gaming console. To play the game, the four received a "room code" that could

be accessed from their cellphones. The game basically involved players drawing t-shirt designs and creating captions. The game then randomly selects drawings and captions, and players vote on the image and caption they believe are the funniest. After multiple rounds, the image and caption receiving the most votes are displayed.

After playing the game, the four left the apartment to get something to eat. Raber and Sammons sat in the front seat of the car, and Lawson and Defendant sat in the back. Allegedly during the ride, Defendant commented to Lawson that no one selected his drawing. Lawson purportedly asked Defendant what he drew, and Defendant allegedly responded that it was a picture of someone shooting a group of people with the caption "1.13.20." Defendant supposedly then giggled and said "the student center is lit." According to the Government, the picture was a stick figure with a firearm shooting at a depiction of the Marshall University student center, and January 13, 2020 was the first day of the term at the University. Four days later, on January 12, Lawson and his girlfriend Eleanor Coggins reported Defendant's actions to the Marshall University Police Department. As part of the investigation, the police also interviewed Raber and Sammons.

In the meantime, on January 9, Defendant returned to where he was living in Lexington, Kentucky. Sometime after midnight on January 13, Defendant went to ex-girlfriend Kaley Spradlin's apartment in Lexington, and there was an altercation.[1] While Ms. Spradlin was

---

[1] According to Defendant, he had moved from West Virginia to Richmond, Kentucky to live with Ms. Spradlin. Shortly after moving to Richmond, Defendant, Spradlin, and two other roommates moved to Lexington. Thereafter, Defendant and Ms. Spradlin ended their relationship, and she moved to another address in Lexington.

inside her apartment, Defendant hit her car with his car at least two times. Sometime later that day, Defendant claims he contacted his therapist, who recommended he seek admission to Cabell Huntington Hospital. Defendant states he had a West Virginia medical card and could not afford to get services in Kentucky. Therefore, Defendant started driving back to West Virginia. However, while on route, he was informed that FBI was at his apartment so he turned around and went back to his Lexington.

Once there, Defendant was questioned by the FBI and Lexington police. According to Defendant, he was persuaded to enter the Eastern State Hospital in Kentucky instead of returning to West Virginia.[2] While hospitalized, Defendant was interviewed by the FBI on January 15, without the benefit of counsel, regarding the January 8 events. According to the United States, Defendant told the agent that he thought about suicide "a lot" and he was thinking about committing suicide both before and after January 8. He also said he felt "somewhat" like he was the victim of bulling as a child. During the interview, the agent also purportedly obtained Defendant's consent to take and search his cellphone.

On January 16, Ms. Spradlin met with the Lexington police. At that time, Ms. Spradlin played a security video to the police from November 20, 2019, which shows Defendant repeatedly ringing her doorbell, knocking on her windows, and refusing to leave the property when asked. Based on the information received from Ms. Spradlin, the officer obtained a criminal complaint against Defendant for harassment, criminal mischief, and wanton endangerment for the

---

[2]Defendants asserts he was involuntarily committed so he could receive services without charge.

events on November 20 and January 13. Defendant was arrested on those charges after he was released from the hospital on January 16.

On January 24, 2020, a warrant was issued to search Defendant's phone. During the search, a number of downloads were discovered relating to school shootings. The dates of the downloads range from May 30, 2017 to December 25, 2019. The Government also asserts that it has interviewed witnesses who have said Defendant

> frequently spoke about school shootings, had discussed the best firearm to use to commit a school shooting, tried to analyze events that occurred after reports of a school shooting, demonstrated an infatuation with the notorious serial killer "Ted Bundy" and described Bundy as "cool," discussed Bundy's characteristics including that the was a narcissist and how his characteristics enabled him to carry out his killings of women, commented on attempts to hurt himself, and stated that he had threatened his ex-girlfriend's most recent roomates.

*Mot. in Lim. of United States Regarding Admis. of Certain Evid.*, at 3 (footnote omitted), ECF No. 32.

In order to prove its case that Defendant violated § 875(c), the Government must establish the following elements: "(1) that the defendant knowingly transmitted a communication in interstate . . . commerce; (2) that the defendant subjectively intended the communication as a threat; and (3) that the content of the communication contained a 'true threat' to . . . injure." *United States v. White,* 810 F.3d 212, 220–21 (4th Cir. 2016). To establish the second element, the Government must demonstrate more than mere negligence. Instead, it must show "that the defendant transmitted the communication 'for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat,' or, perhaps, with reckless disregard for the

likelihood that the communication will be viewed as a threat." *Id*. at 221 (quoting *Elonis v. United States*, 135 S. Ct. 2001, 2012-13 (2015). To prove the third element, the Government "must show that an ordinary, reasonable recipient who is familiar with the context in which the statement is made would interpret it as a serious expression of an intent to do harm." *Id*. (citation omitted). In this case, the Government argues the evidence at issue demonstrates Defendant's state of mind, knowledge the threat actually would be viewed as a threat, and the threat was a "true threat."

In its motion, the Government seeks an advance ruling on the admissibility of the evidence it intends to offer at trial to prove the elements of § 875(c). In support of its motion, the Government argues the evidence it intends to offer is intrinsic to the crime charged and, therefore, the Court need not undergo an analysis under Rule 404(b) of the Federal Rules of Evidence. However, even if the Court does an analysis under Rule 404(b), the Government maintains the evidence is still admissible.

Evidence is intrinsic, and therefore not barred by Rule 404(b), if it "arose out of the same . . . series of transactions as the charged offense, . . . or if it is necessary to complete the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (internal quotation marks and citations omitted). The "complete the story" determination is a "case-by-case, fact-based" analysis. *United States v. Brizuela*, 962 F.3d 784, 794 (4th Cir. 2020). In order "for evidence of uncharged conduct to be admissible to 'complete the story' of a charged offense, the evidence must be probative of an integral component of the crime on trial or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *Id.* at 795. *See Kennedy*, 32 F.3d at 886 (finding that testimony

relating to uncharged distribution activities was admissible because it placed the charged activity in context, addressed the source of the drugs the defendant was charged with distributing, and "proved [the defendant's] participation in drug distribution activities"). Evidence is not "necessary to complete the story of the crime," however, if the evidence is not needed to prove an element of the crime or it is not "essential to understanding how the offense was committed." *Brizuela*, 962 F.3d at 796 (finding testimony of the defendant doctor's patients whose treatment was not the subject of the charged drug-distribution defense was not intrinsic evidence when the testimony was not needed to help the fact finder determine whether there was sufficient evidence to convict the defendant of the charged offense); *see also United States v. McBride*, 676 F.3d 385, 388–90, 396–98 (4th Cir. 2012) (finding testimony of confidential informant regarding a prior attempted drug purchase from the defendant was not admissible as intrinsic evidence because it was not necessary to "complete the story" of the charged offense of drug possession more than a year after the informant's contact with the defendant).

The "complete the story" doctrine cannot be used to circumvent Rule 404(b). *See Brizuela*, 962 F.3d at 795. Therefore, there must be a "hard look to ensure that there is a clear link or nexus between the evidence and the story of the charged offense, and that the purpose for which the evidence is offered is actually essential." *Id.* If evidence is not "necessary to complete the story," it is deemed "extrinsic" and is subject to the confines of Rule 404(b). *See id.* at 793. Rule 404(b)(1), states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evidence of "bad acts" may be admissible if it is used for some other purposes, such as motive or intent. Fed. R. Evid. 404(b)(2); *Brizuela*, 962 F.3d at 797. The Government bears

the burden of showing that the prior-act evidence is (1) relevant for a proper non-character purpose, (2) necessary to prove an essential element of the crime (3) reliable, and (4) its probative value is not "substantially outweighed" by its prejudicial nature under the Rule 403 balancing test. *Brizuela*, 962 F.3d at 797–98 (citing *United States v. Hall*, 858 F.3d 254, 266 (4th Cir. 2017)).

Here, the Government divides the evidence into four categories. First are the photos and videoclips found on Defendant's cellphone. Second are the statements Defendant made to the police. Third are the statements Defendant made to others. Fourth is evidence regarding his breakup with his girlfriend. The Court considers each of these categories separately.

In support of its argument that the cellphone photos and videoclips should be admitted, the Government argues they are relevant to Defendant's state of mind and his obsession with mass shootings. In all, there are sixteen photographs (memes) and two short videoclips. *See Exs. 1, 2*, ECF No. 32-1, 2; ECF No. 33. Five of the pictures were downloaded on May 30, 2017 (pictures 1, 2, 3, 6, & 13), two were downloaded on June 1, 2017 (pictures 9 & 14), five were downloaded on June 24, 2017 (pictures 4, 5, 7, 8, & 15), one was downloaded on February 28, 2018 (picture 16), one was downloaded on October 18, 2019 (picture 11), and two were downloaded on December 25, 2019 (pictures 10 & 12). In addition, the videoclips were downloaded on May 30, 2017. All the pictures and videos were downloaded from the website "ifunny.co," which Defendant contends contains satirical and dark-humor memes and videos. The pictures and videoclips at issue here all portray disturbing references to Columbine, Sandy Hook, and general school shootings.

As explained at the hearing, with the exception of the two pictures that were downloaded on December 25, 2019, the Court finds that the photos and videoclips were downloaded so remote in time to the offense charged that they could not be considered intrinsic evidence. They did not arise "out of the same . . . series of transactions as the charged offense," nor are they "necessary to complete the story of the crime on trial." *Kennedy*, 32 F.3d at 885. Turning then to a Rule 404(b) analysis, the Court also finds these "remote in time" pictures and videoclips are inadmissible. Given the very sensitive and emotionally charged nature of these photos and videos, the Court finds any probative value these pictures may have is "substantially outweighed" by their prejudicial effect under Rule 403, to which a limiting instruction would be unable to cure.

As to the two pictures downloaded on December 25, 2018, the Court recognizes that those downloads were made much closer in time to the events alleged here. The first of those pictures shows a black man, who resembles Eddy Murphy, pointing at his head with a captain "YOU CANT BE A SCHOOL SHOOTER IF YOUR NOT WHITE[.]" ECF No. 32-1, at 10. The other picture shows a close-up of a young white man's face with the captain "WHEN THE SCHOOL SHOOTER RUNS OUT OF AMMO[.]" *Id*. at 12. As these two photos were downloaded approximately just two weeks before Defendant's drawing, it creates a much clearer nexus between the pictures, the charged offense, and Defendant's subjective intent when he drew the picture. Thus, although the pictures are undoubtedly highly prejudicial, they are admissible as extrinsic evidence under a Rule 404(b) analysis as they go to his knowledge and intent.

Turning next to the statements Defendant made to the police and other witnesses. At this point, the Court only has a general understanding of what the police and other witnesses precisely will say. However, the Court finds those statements Defendant made to the police in response to questions tied to the videogame, although not intrinsic, are nevertheless admissible as they go to Defendant's state of mind and the probative value of those statements outweighs their prejudicial effect. Likewise, statements made to his friends or others related to the drawing also are admissible as direct evidence to show Defendant's state of mind. However, the Court finds that the statements he made to others about his fascination with serial killers, such as Ted Bundy, are inadmissible as not intrinsic or even probative as to the elements of the crime alleged here. Additionally, these comments seem to have been made long before Defendant made his drawing. Likewise, the Court finds the Government has failed to show that Defendant's comments he felt suicidal are probative to the crime alleged here, specifically as to his intent to hurt others. Thus, those comments are not admissible.

Finally, the Government seeks to admit evidence that Defendant had ended a relationship with Ms. Spradlin, said he was distraught over the breakup, and said he would kill her roommates. At this point, it is somewhat unclear to the Court at what point in time and in what context these particular statements were made to the various witnesses. To the extent these statements were made contemporaneously with playing or discussing the game, the Court finds them admissible as direct evidence to show Defendant's state of mind. However, to the extent the statements were made at some remote time to the offense charged, the Court finds they are neither intrinsic nor probative to the crime alleged and, thus, inadmissible.

Accordingly, for the reasons stated above, the Court **GRANTS, IN PART,** and **DENIES, IN PART** the United States' Motion in Limine Regarding Admissibility of Certain Evidence. ECF No. 32. At the hearing, the United States also withdrew its Motion to Allow Witness to Appear via Teleconference (ECF No. 39). Therefore, the Court **DENIED** that motion as **MOOT**.[3]

Finally, at the conclusion of his Response, Defendant requests an Order prohibiting the United States from calling his mother to testify. The United States has submitted a Witness List to the Court, and Defendant's mother is not included on that list. Therefore, to the extent Defendant's request may be interpreted as a motion, it is **DENIED WITHOUT PREJUDICE**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: August 26, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[3]On August 25, 2020, the United States renewed its motion to allow the witness to appear via teleconference. ECF No. 47. The Court denied that motion by a separate Order. ECF No. 51.